❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. 22-1844M(NJ) |
| The cellular telephone assigned call number (760) 906-3615 | ) |
| whose service provider is AT&T, a wireless communications | ) |
| service provider that is headquartered in North Palm Beach, | ) |
| Florida, 33408 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before      December 5, 2022      *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Honorable Nancy Joseph _____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for  30  days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:  11/21/2022 4:43 pm_____

_____
*Judge's signature*

City and state:  Milwaukee, WI_____          Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.:<br>22-1844M(NJ) | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned call number **(760) 906-3615** (referred to herein and in Attachment B as "**Target Cell Phone**"), with listed subscriber unknown, that is in the custody or control of AT&T, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 111760 US Highway 1, North Palm Beach, Florida, 333408.

2.      The Target Cell Phone.

## ATTACHMENT B

### Particular Things to be Seized

## I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.      The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period October 1, 2022, to the present:

   i.      Names (including subscriber names, user names, and screen names);

   ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.    Local and long distance telephone connection records;

   iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.      Length of service (including start date) and types of service utilized;

   vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber

Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period September 1, 2021, to the present including:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of **30** days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT,

2

True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c.  Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, RTT data, GPS data, latitude-longitude data, and other precise location information.

i.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Jimmy GONZALEZ MACIAS, a/k/a Jimmy MACIAS (MACIAS).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts

3

under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

Case 2:22-mj-01844-NJ   Filed 11/21/22   Page 7 of 42   Document 1

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>The cellular telephone assigned call number (760) 906-3615 whose<br>service provider is AT&T, a wireless communications service<br>provider that is headquartered in North Palm Beach, Florida, 33408 | )<br>)<br>)<br>)<br>)<br>)     Case No.22-1844M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of and possession with the intent to distribute controlled substances |
| 21 U.S.C. § 846 | Conspiracy to distribute and possess with the intent to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _30_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JEREMY S DORN   Digitally signed by JEREMY S DORN<br>Date: 2022.11.17 16:56:27 -06'00'

*Applicant's signature*

Jeremy Dorn, Special Agent, HSI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date 11/21/2022: _____

*Judge's signature*

City and state:   Milwaukee, WI       Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jeremy Dorn, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for the information about the location of the cellular telephone assigned call number **(760) 906-3615** ("**Target Cell Phone**"), whose service provider is AT&T ("AT&T" or "Service Provider"), a wireless telephone service provider headquartered at 11760 US Highway 1, North Palm Beach, Florida, 333408. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I am a Special Agent of the United States Department of Homeland Security, Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I have been a federal law enforcement agent for

1

over ten years.  I have received basic criminal investigative training, including thirty-six weeks at the Federal Law Enforcement Training Center (FLETC).  In the course of my work, I have become knowledgeable with the enforcement of federal laws pertaining to narcotics and dangerous drugs. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4.     I have participated in drug trafficking investigations conducted by HSI, the Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), the United States Postal Service (USPS) and other law enforcement agencies, which resulted in the arrest of subjects, and the seizure of property, assets, and controlled substances.  I am currently a member of the North Central High Intensity Drug Trafficking Area (HIDTA) Task Force assigned to the opioid initiative as an investigator specializing in the smuggling, trafficking, and distribution of dangerous and controlled substances.  I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances.  I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers.

5.     In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of individuals involved in federal criminal offenses. I am familiar with and have experience in the use of cellular devices used to commit those offenses as well

2

as the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their locations.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

8.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution of and possession with the intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with the intent to distribute controlled substances) have been committed, are being committed, and/or will be committed by Jimmy GONZALEZ MACIAS a/k/a Jimmy MACIAS (MACIAS), (DOB: XX/XX/1997). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

9.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court

is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

10. In January 2022, law enforcement officers in Milwaukee, Wisconsin, initiated an investigation into individuals distributing large quantities of methamphetamine and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement officers identified the leader of the drug trafficking organization (DTO) to be Phillip DANIELS SR. (DANIELS) (DOB: XX/XX/1976). The investigation has revealed that DANIELS obtains controlled substances from source(s) of supply in California. The controlled substances have been sent to Milwaukee, Wisconsin, and St. Paul, Minnesota, using the United Postal Service (UPS), FedEx, and/or United States Postal Service (USPS), or couriers drive the controlled substances from California to the Midwest United States at the direction and control of DANIELS. The DTO has established distribution locations in Milwaukee, Wisconsin, St. Paul/Minneapolis, and Chicago, Illinois/Northern Indiana. Through investigation, case agents learned that the DANIELS DTO distributes methamphetamine, heroin, fentanyl, cocaine, and marijuana.

11. According to the investigation, DANIELS travels on a frequent basis. Airline records reflect that DANIELS took multiple flights, often with other DTO members, to California from 2020 through 2022. Based upon familiarity with this investigation, agents believe that the purpose of these travels was to obtain and arrange for the transportation and/or shipment of controlled substances. Since at least late 2020, DANIELS has frequently traveled to the area of St. Paul, Minnesota, and Chicago,

Illinois, which are believed to be a DTO distribution locations.

12. The investigation to date has revealed that MACIAS works with Deonte EDWARDS, among others, to supply the DANIELS DTO with controlled substances, to include fentanyl. Deonte EDWARDS sends parcels suspected to contain controlled substances to various DTO-associated addresses.

13. This knowledge is based on a variety of investigative techniques, including but not limited to physical and electronic surveillance, pen register and trap and trace records, interceptions of DTO parcels, interviews with confidential sources, and court-authorized Title III interceptions, as set forth below. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all my knowledge of or investigation into this matter.

**Confidential Source Information – CS 1**

14. In early 2021, DEA and the Bureau of Criminal Apprehension in Minneapolis/St. Paul, Minnesota, were conducting a drug trafficking investigation in which approximately five pounds of methamphetamine, paraphernalia consistent with kilogram level distribution, and U.S. currency were seized from an individual later identified as CS 1.

15. Beginning in November 2021, law enforcement conducted an interview of CS 1. CS 1 stated that CS 1 has known "Dr. Phil" since approximately September 2020. CS 1 identified DANIELS by photograph as "Dr. Phil." CS 1 stated that CS 1 sold multiple kilograms of cocaine, heroin, and methamphetamine for DANIELS and HENTON from approximately September 2020 to January 2021, in the St.

5

Paul/Minneapolis area. According to CS 1, the narcotics were shipped to Minnesota, and a typical shipment would contain six kilograms of cocaine, six kilograms of heroin, and approximately thirty pounds of methamphetamine.

16.     CS 1 indicated that DANIELS traveled via a commercial airline multiple times a month to see if people were ready for more controlled substances, i.e., resupply and/or collect money from his various runners who assisted the DTO. CS 1 stated that DANIELS took these flights with U.S. currency inside of DANIELS' luggage. CS 1 stated that DANIELS established numerous LLCs, which DANIELS uses to obtain loans to move money. CS 1 indicated that DANIELS directed CS 1 to sell the narcotics, and DANIELS picked up the money at a later date. CS 1 indicated that if DANIELS did not pick up the money, CS 1 deposited drug proceeds into a Chase bank account under one of DANIELS' LLCs associated with a health care business, possibly "First Responsive Supportive Care." CS 1 provided a phone number for DANIELS in which CS 1 would call when more product was needed or if the money was ready for pick up. Case agents were able to verify the phone number CS 1 provided was an old number used by DANIELS.

17.     CS 1 stated that in July of 2020, DANIELS and others flew to California where CS 1 met them. CS 1 drove them around and picked items up for them. CS 1 observed DANIELS and two other individuals open their luggage and remove multiple freezer sealed bags with U.S. currency. CS 1 observed one of the subjects leave and come back with a money counter. CS 1 indicated that after the money was counted, CS 1 drove

6

DANIELS and the others to a different location and dropped them off. CS 1 later picked up DANIELS and the others that same day after a short period of time.

18.    CS 1 identified additional DTO subjects, to include, but not limited to, Jameel BRADLEY SR., Leroy HENTON, and FRYER.

19.    CS 1 further stated that CS 1 delivered narcotics to FRYER's residence located at 234 E. Bates Avenue, St. Paul, Minnesota. According to CS 1, DANIELS instructed CS 1 to provide FRYER with pills and cocaine, which FRYER then distributed.

20.    Beginning in November 2021, CS 1, made statements against CS 1's penal interest. CS 1 has an armed robbery conviction, two firearm convictions, and one federal narcotics trafficking conviction.  CS 1 is cooperating in exchange for consideration on the federal narcotics trafficking conviction. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 1's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. CS 1's information has also been corroborated by digital evidence contained on CS 1's cell phone, such as text messages, photographs, and geolocation information. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

**DTO Parcels**

21.    Between approximately October 7, 2021, through October 4, 2022, at least forty parcels suspected to contain controlled substances have been delivered to

7

addresses associated with the DTO. These parcels have been identified as being associated with the DTO because the parcels have been traced to the same group of senders, and the listed recipients are often identified DTO members, to include DANIELS, Joelle MASSEY, Christopher DANIELS (now deceased), Michelle HAUCK, or a few select other names believed to be nominee names. The receiving addresses include, but are not limited to, the following:

a.      8708 N. Deerwood Drive, Brown Deer, Wisconsin: a former residence shared by DANIELS and MASSEY.

b.      234 Bates Avenue, Saint Paul, Minnesota: a former residence shared by DANIELS and Ramona FRYER. DANIELS has been observed at this residence, and court authorized location information reflects that DANIELS was frequently in the area of this residence. FRYER is believed to be a Minnesota-based DTO distributor.

c.      9905 W. Fond Du Lac Avenue, Milwaukee, Wisconsin: the residence of D.B. and K.B. D.B. and K.B.'s Medicaid information has been used by a home health care company, A Touch of Love Supportive Care Agency (ATOL), operated by Roy HENTON.

d.      5234 N. Teutonia Avenue, Milwaukee, Wisconsin: a residence frequented by DANIELS.

e.      3259 N. 48th Street, Milwaukee, Wisconsin: a vacant residence.

f.      6617 N. 103rd Street, Milwaukee, Wisconsin: a vacant residence.

g.      10018 W. Fond Du Lac Avenue, Milwaukee, Wisconsin: a residence directly next to DANIELS' former residence (10016 W. Fond Du Lac Avenue). DANIELS

8

has been observed obtaining from this address parcels suspected to contain controlled substances on two occasions.

**Title III Authorization**

22.     In the court of this investigation, the United States District Court for the Eastern District of Wisconsin authorized the following interceptions pursuant to 18 U.S.C. § 2518:

    a.      On August 24, 2022, the Honorable Judge J.P. Stadtmueller issued an Order authorizing the initial interception of wire communications over phone number (262) 599-3332 (TARGET TELEPHONE 1), used by HENTON, and phone number (213) 444-9828 (TARGET TELEPHONE 2), used by DANIELS. Interceptions pursuant to this Order began on August 24, 2022 and ended on September 22, 2022.

    b.      On September 30, 2022, the Honorable Pamela Pepper issued an Order authorizing the continued interception of wire communications over TARGET TELEPHONE 1, used by HENTON; the continued interception of wire communications and the initial interception of electronic communications over TARGET TELEPHONE 2, used by DANIELS, the initial interception of wire communications over phone number (773) 934-9062 (TARGET TELEPHONE 3), used by BRADLEY SR.; and the initial interception of wire and electronic communications over phone number (773) 948-2322 (TARGET TELEPHONE 4), used by DANIELS. Interceptions pursuant to this Order began on September 30, 2022 and ended on October 29, 2022. However, interceptions over TARGET TELEPHONE 3 ended on October 20, 2022, due to inactivity.

9

23.    On November 3, 2022, the Honorable J.P. Stadtmueller issued an Order authorizing the continued interception of wire and electronic communications over TARGET TELEPHONE 2, used by DANIELS; the continued interception of wire communications over phone number (773) 948-2322 (TARGET TELEPHONE 4), used by DANIELS; and the initial interception of wire and electronic communications over phone number (708) 635-3573 (TARGET TELEPHONE 5), used by BRADLEY SR. Interceptions pursuant to this Order began on November 4, 2022, and are scheduled to end at 11:59 p.m. on December 2, 2022.

## MACIAS is a DTO Supplier

24.    The investigation has revealed that MACIAS supplies controlled substances, to include methamphetamine, cocaine, and fentanyl, to the DANIELS DTO. Between November 7 and 10, 2022, DANIELS traveled to California on behalf of the DTO. During this trip, DANIELS met with MACIAS to procure controlled substances. DANIELS sent EDWARDS to MACIAS' house to provide payment and obtain controlled substances. EDWARDS' phone location information revealed that on November 10, he left the vicinity of his residence, traveled to MACIAS' known residence, and traveled back within the vicinity of his residence. Case agents believe that once at MACIAS' house, EDWARDS prepared and packaged the recently obtained controlled substance to ship to the DANIELS DTO. DANIELS' departed LAX on November 10, 2022. On November 11, 2022, a parcel destined to a Milwaukee DTO-related address was searched pursuant to a search warrant and found to contain one kilogram of fentanyl. Based upon intercepted calls, and

10

the stamp, or "signature" on the fentanyl, case agents believe that the fentanyl was supplied by MACIAS.

25.     Additionally, the investigation has revealed that MACIAS has not only been in contact with DANIELS, but also with two other Chicago-based DTO members, BRADLEY SR. (BRADLEY SR.) and Itzel CRUZ-GONZALEZ (CRUZ-GONZALEZ). Based upon intercepted communications, case agents believe that DANIELS, BRADLEY SR., and CRUZ-GONZALEZ are working together to procure controlled substances from MACIAS.

26.     During the course of this investigation, case agents determined that MACIAS has used phone number (760) 906-3615 (**Target Cell Phone**), subscribed to by Jimmy MACIAS, to further DTO activities. Between approximately November 8, 2022, and November 11, 2022, approximately 18 intercepted calls between MACIAS and DANIELS were deemed criminal and pertinent in nature.

27.     Additionally, between July 20, 2022, and November 11, 2022, MACIAS had 26 contacts with DANIELS at Target Telephone 2, five contacts with BRADLEY SR. at Target Telephone 3, 49 contacts with BRADLEY SR. at Target Telephone 5, 22 contacts with additional numbers believed to be used by BRADLEY SR., and 72 contacts with CRUZ-GONZALEZ, at her known intercepted phone number (323) 604-6132.

**MACIAS is believed to supply the DTO with methamphetamine**

28.     On October 7, at 3:43 p.m., BRADLEY SR., using Target Telephone 3, called CRUZ-GONZALEZ at (323) 604-6132. During the conversation, CRUZ-

11

GONZALEZ questioned, "The fuck it did…why the fuck did his people send that shit." BRADLEY SR. replied, "You gotta understand that with him, because, that's not right on our end, bro, like, that's not cool…How we gonna develop a relationship and this shit—right now, it's not even…" CRUZ-GONZALEZ replied, "That's what I was telling him." BRADLEY SR. stated, "This don't even look good on them." CRUZ-GONZALEZ said, "Like, you already made me look bad. I'm like, now this, like, c'mon now. He's like 'nah, that's bullshit,' he's like, 'you know I've never done shit like this.' I'm like, exactly! So what the fuck is going on? I'm like, why did you say you didn't do it, so look at what they fuckin' sent!" BRADLEY SR. replied, "Right bro. Come on, man." CRUZ-GONZALEZ said, "I'm like bro, it's one after another thing. Dude, I'm like, I keep hearing it. I'm like, that shit's not cool. Man, he's like, 'that's bullshit, like, you know I never give you shit like that.' I'm like, exactly. The fuck. I'm like, what is that? I'm like, this has never happened." BRADLEY SR. stated, "Well, it's happened to us now. All five of 'em, bogus as hell. I'm sitting here watchin' him opening 'em up. All them black; it's all of 'em black. And all of 'em is shake. All of it shake...So what he gonna do? Like, we gonna send this shit back to him, or what?" CRUZ-GONZALEZ replied, "I'm telling him that shit right now." BRADLEY SR. questioned, "Like, how we gonna do this? He'll give us our money back?"

29.     Based on their training, experience, and knowledge of this investigation, case agents believe that CRUZ-GONZALEZ and BRADLEY SR. purchased five kilograms of a controlled substance. CRUZ-GONZALEZ and BRADLEY SR. received the controlled substance, but were unsatisfied with the purity or quality, ("All five of

12

'em, bogus as hell"), and wished to get their money back, ("He'll give us our money back?"). Case agents know that good quality-controlled substances results in a larger customer base and larger profits. Therefore, BRADLEY SR. and CRUZ-GONZALEZ were upset with the quality of the controlled substance they received.

30.     After the above noted call, phone toll records reflect that CRUZ-GONZALEZ, using (323) 604-6132, had three phone contacts with MACIAS (5:36 p.m., 6:24 p.m., and 6:28 p.m.) Based upon the close proximity of CRUZ-GONZALEZ' contacts with MACIAS, case agents believe she called MACIAS to address the poor quality substance that MACIAS supplied.

31.     On November 7, 2022, at 9:47 p.m., BRADLEY SR., using Target Telephone 5, called CRUZ-GONZALEZ at (323) 604-6132. BRADLEY SR. stated, "Hello, Gucci said he give me no five motha fucking uh, them five he owe me to my brother. He out there." CRUZ-GONZALEZ replied, "To give you five of the work?" BRADLEY SR. responded, "What he owe me! Five, five pounds!" CRUZ-GONZALEZ stated, "Okay, let me see if I can get ahold of it. Hold of him, okay." BRADLEY SR. replied, "Say, my brother's out there right now." CRUZ-GONZALEZ said, "He was, he was telling me, he was just telling me about on Saturday. He was like I got work. But it's the same like. Let me just talk to him." BRADLEY SR. replied, "I want no bull, I don't want that same shit." CRUZ-GONZALEZ affirmed, "I know, that's what I'm telling you. He has that bullshit again and that's what I told him. They don't want that. If that's what you got, then send the money." BRADLEY SR. stated, "Yup, my brother out there right now." CRUZ-GONZALEZ said, "But, if he's over there he can go check

13

it out." BRADLEY SR. affirmed, "Yup!" CRUZ-GONZALEZ said, "So, let me, let me. Fuck man. Let me try and get ahold of this stupid ass." BRADLEY SR. affirmed, "Yes, indeed." CRUZ-GONZALEZ replied, "Yeah, cause he not picking up or nothing babe." BRADLEY SR. said, "Alright, try and get ahold of em."

32.     Based on their training, experience, and knowledge of this investigation, case agents believe that during this call BRADLEY SR. and CRUZ-GONZALEZ discussed the situation from the October 7 call regarding the bad narcotics they received and their attempt to get their money back. Based on these two calls, as well as their training, experience, and knowledge of this investigation, case agents believe that BRADLEY SR. and CRUZ-GONZALEZ received five pounds of poor-quality methamphetamine ("Five, five pounds!").  Based on their training and experience, case agents know that crystal methamphetamine is exclusively sold by the pound when bought in bulk. Controlled substances such as cocaine and heroin are commonly sold by the kilogram when sold in bulk. Case agents know that "work" is a common slang term for a controlled substance such as crystal methamphetamine, cocaine, heroin, or fentanyl.

33.     Furthermore, case agents believe that during the November 7 call CRUZ-GONZALEZ told BRADLEY SR. that she would contact the source of supply to return or replace the poor quality methamphetamine they received. CRUZ GONZLEZ is believed to have stated that she recently talked to the supplier, who informed her that he (supplier) had more methamphetamine ("work"). CRUZ-GONZALEZ and BRADLEY SR. agreed that if it was the same methamphetamine as previously

14

received, they did not want it. ("I want no bull, I don't want the same shit.") If the supplier had the same product, CRUZ-GONZALEZ and BRADLEY SR. wanted their money back. ("If that's what you got, then send the money.")

34.     Additionally, case agents believe that BRADLEY SR. told CRUZ-GONZALEZ to have MACIAS give the new product to DANIELS ("them five he owe me to my brother. He out there."; ""Yup, my brother out there right now."). At the time of the November 7 call, DANIELS was in California. Case agents know that BRADLEY SR. commonly calls DANIELS his "brother." Case agents further believe that CRUZ-GONZALEZ stated that DANIELS should go make sure the methamphetamine was of good quality before they purchased more. ("But, if he's over there he can go check it out.").

35.     Two days later, on November 9, at 10:36 p.m., MACIAS called BRADLEY SR. at Target Telephone 5. During this call, BRADLEY SR. stated, "You met my brother last night."  MACIAS responded, "Yep." BRADLEY SR. replied, "He like you, so we are gunna be doing more business with you."

36.     Case agents know that BRADLEY SR. and DANIELS refer to each other as "brother." Therefore, agents believe that this call reflects that MACIAS met DANIELS the previous night, November 8, 2022, (as will be demonstrated below), and that BRADLEY SR. and DANIELS plan to arrange more drug business in the future.

37.     Further, location information for DANIELS' Target Telephone 2 reflected that on the evening of November 8, 2022, he left the area of EDWARDS' residence around 8:30 p.m. and arrived in the vicinity of MACIAS' residence, around 12:00 a.m.

15

on November 9, 2022. DANIELS' remained in the vicinity of MACIAS' residence until approximately 2:50 a.m., at which time he traveled back to Van Nuys.

### DANIELS arranges drug transactions with MACIAS

38.    On November 9, 2022, at approximately 8:52 p.m., DANIELS, using Target Telephone 2, received a call from MACIAS at (760) 906-3615 (**Target Cell Phone**). During the call, DANIELS asked MACIAS what he was up to. MACIAS stated that he was almost to his (MACIAS') house. DANIELS stated, "Okay, we gon' slide; we gon' fall through." MACIAS responded, "Okay, uh, I was ask if you need the other one." DANIELS asked, "Um, you know, you know, the rest of that one that you had?" MACIAS responded, "Uh-huh." DANIELS replied, "I want to come get that." MACIAS then said, "All right, uh, the other one I finna—I finna keep breaking that one down." DANIELS stated, "Boy, I was on my way. I was on my way for it, Jimmy. After DANIELS repeated that he was on his way for it, MACIAS replied, "You wish. In case you want, you want to take half of it? If you want to take a nine-piece out of it, yeah?" DANIELS then said, "Okay cool; I do that."  MACIAS replied, "Just leave me something, because you'd be, you'd be getting like one and two, so." DANIELS stated, "All right, I got you. Yeah, yeah then listen… I'm gonna be having my brother, my brother doing it. I'm gonna have my brother coming by for that two, okay?"  MACIAS acknowledged. DANIELS continued, "'Cause I be doing some small ones out here and I let just so he can make some money… But he's our little runner. Whenever you need him, he's gon run. That's that one, the first number I sent you. It say, 'Deonte.'" MACIAS said, "Okay. Hold up, what do you—you want to leave him with a half right

16

there just in case he comes?" DANIELS replied, "Right, yeah, right. See, that's what I'm saying, like when I, I want to do something like that. You know what I'm saying?"

39.     Based on their training, experience, and knowledge of this investigation, case agents believe DANIELS wanted to purchase one kilogram of cocaine from MACIAS, who had two kilograms ("I was ask if you need the other one."). Agents further believe MACIAS told DANIELS he (MACIAS) was breaking down one of the kilograms and DANIELS could have a "nine-piece," which agents know is a reference to nine ounces of cocaine. MACIAS then told DANIELS that he (MACIAS) can give him half of the kilogram, or 500 grams, which DANIELS accepted. Agents further believe that DANIELS informed MACIAS that EDWARDS ("Deonte") is a runner (a person who picks up/delivers money and narcotics) for the DTO, and that EDWARDS will be assisting with picking up narcotics. At approximately 10:35 p.m., MACIAS called DANIELS, who said that he "got an extra energy" and was on his way to meet MACIAS to pick up the cocaine.

40.     On November 10, at 11:29 a.m., MACIAS called DANIELS at Target Telephone 2, at which time DANIELS stated, "I mean, like 12 o'clock." MACIAS stated, "Okay, I'm just waiting on this [U/I] to call me so I can go pick those up." DANIELS replied, "Tell that fool to bring his ass home. Tell him to get his ass up. We got shit to do. We trynna get that shit out today."

41.     Based on their knowledge of this investigation, case agents believe that DANIELS was attempting to meet with MACIAS at 12:00 p.m. to purchase more controlled substances. Case agents knew that DANIELS had a flight to Chicago on

17

November 10, 2022, and therefore believe that DANIELS wanted MACIAS to hurry because DANIELS wanted to ship the controlled substances before his plane left.

42.    At 11:30 a.m., MACIAS called DANIELS back at Target Telephone 2 and stated, "I just talked to him right now." DANIELS replied, "You did? What did he say?" MACIAS stated, "He told me to go pick up those two that he said he didn't come with the food for the other one, for the one." DANIELS replied, "Okay, cool. Well, go grab those two real quick, and then we just, we gonna try wrapping everything up."

43.    Case agents believe that MACIAS told DANIELS he (MACIAS) called his controlled substance supplier and obtained two kilograms of a controlled substance to sell to DANIELS.  MACIAS' supplier was unable to obtain the third kilogram that DANIELS had originally requested, but DANIELS indicated he would obtain those from MACIAS at a later time.

44.    On November 10, at 5:39 p.m., DANIELS, using Target Telephone 2, called MACIAS, using the **Target Cell Phone**. DANIELS stated, "I'm sending my little brother to you because I'm getting on my plane, and he gonna handle everything." MACIAS replied, "Okay, I was gonna ask you, ummm, you need these two ASAP?" DANIELS replied, "I need them ASAP. Just, I'm send them—listen: Give them to my brother, you good to go." DANIELS later stated, "Take them what's his name. I'm gonna start sending you bread immediately. You hear me?" DANIELS continued, "The one who you—who's coming to you now, right? He's the one that's going to be bringing, he's the one who's going to be bringing money to you. You hear me? So, listen to me: You and me are going to be in communication all this week and all next

18

week. You're going to have nothing but money coming. I gotchu. I gotchu." MACIAS replied, "Ok, yeah, 'cause—'cause I was gonna say, about that [U/I], remember I told you I was going to get that semi-truck tomorrow? Yeah, I [U/I] some bread for that, so."

45.　Through interceptions, case agents know that DANIELS commonly refers to EDWARDS as his "brother" or "little brother." Therefore, case agents believe DANIELS told MACIAS he was sending EDWARDS to obtain two kilograms from MACIAS ("[Y]ou need these two ASAP?"). Case agents further believe that DANIELS told MACIAS that EDWARDS would be bringing MACIAS U.S. currency ("bread") in exchange for the controlled substances.

46.　At 5:57 p.m., DANIELS, using Target Telephone 2, called the **Target Cell Phone**, used by MACIAS, and stated, "Don't worry about the, uhhh, Playboy right now. He gonna give you the other 15. Take—put that with that." MACIAS affirmed, "Okay, yeah." DANIELS said, "And hold that for what you giving me right now, okay? And then when I get home, right? . . . I'll send, I'll send out some more and we can—we will wrap up that. We just tell your boys and them to hold off on the Playboy right now."

47.　Based on their training, experience, and knowledge of this investigation, case agents believe that during this call DANIELS told MACIAS not to worry about the fentanyl ("Playboy") at the moment. Case agents believe "Playboy" in the context of this call refers to fentanyl because on November 11, 2022, case agents seized a DANIELS DTO parcel and observed that the "Playboy bunny" logo was stamped on a

19

brick of substance that field tested positive for fentanyl. Case agents further believe that DANIELS told MACIAS to put the money EDWARDS would soon be delivering towards the current drug order. DANIELS told EDWARDS that once he returned home, he would send more money for the fentanyl ("Playboy").

**Seizure of one kilogram of "Playboy" fentanyl**

48.     As a result of DANIELS' California trip, case agents are aware of at least five drug-related parcels that were shipped to various DTO addresses. Since DANIELS returned from California, he has communicated over Target Telephone 2 with EDWARDS about ensuring EDWARDS "has enough money for supplies," to include "foam." DANIELS and EDWARDS also discussed the status of multiple parcels that were shipped to DTO addresses, trying to determine which ones were delivered and where the others were in transit.

49.     On November 11, 2022, case agents located an 11-pound parcel, sent from California on November 8, 2022, set to be delivered to 9905 West Fond Du Lac Avenue. The listed sender on the parcel was Diego BIRRUETA of 13330 Victory Boulevard, Van Nuys, California. The listed recipient of the parcel was Andre Garner of 9905 West Fond Du Lac Avenue, Apartment #1, Milwaukee, Wisconsin. The parcel was thereafter searched pursuant to a warrant. Upon opening the parcel, case agents found an off-white plastic dog food container (similar to other seized DTO parcels) surrounded by Styrofoam packing peanuts. Upon opening the container, case agents found two pairs of children's shoes and other children's items. Underneath those items was a foam-like substance. Under the foam, case agents found a brick-shaped object wrapped in

20

numerous layers of plastic. Inside of the wrapping was a clear plastic vacuum sealed bag. Inside of the sealed bag was more plastic wrapping. Inside of the final layer of plastic wrapping was a white brick-like substance, which was stamped with the Playboy Bunny logo in the center of the object. The suspected controlled substance field tested positive for the presence of fentanyl and weighed 1,125 grams.

50.     During an intercepted phone call on November 10, 2022, at 5:57 p.m., between DANIELS, using Target Telephone 2, and MACIAS, using (760) 906-3615 (**Target Cell Phone**), DANIELS referenced "Playboy" numerous times. DANIELS stated, "Don't worry about the, uh, Playboy right now… Just tell your boys and them to hold off on the Playboy right now." Case agents know that traffickers commonly stamp their products as a signature. Based on the stamp located on the seized brick of fentanyl and the intercepted phone calls, case agents believe that DANIELS obtained the fentanyl from either MACIAS or from an unidentified co-conspirator who works with MACIAS.

51.     During the course of the investigation, case agents obtained a subpoena, sent to AT&T, for subscriber information associated with the phone number (760) 906-3615, or the **Target Cell Phone**.  Information obtained from AT&T revealed that the subscriber information for the **Target Cell Phone** lists to "Jimmy MACIAS" at 1916 W. Broadway, Anaheim, CA 92804, the known residence of MACIAS.

## <u>CONCLUSION</u>

52.     MACIAS operates the **Target Cell Phone**. The location data associated with the **Target Cell Phone** will assist case agents in conducting targeted physical

21

surveillance and further identify the locations and individuals associated with and the nature, scope, and structure of the DANIELS' DTO.

53.     Case agents searched law enforcement databases to confirm that the **Target Cell Phone** is currently being serviced by AT&T.

54.     Case agents are requesting this warrant authorizing the initial collection of data related to the **Target Cell Phone** for **30** days to further investigate MACIAS' activities, and to identify locations to which MACIAS is traveling to further his drug distribution network and money laundering activities.

55.     Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that MACIAS is engaged in the trafficking and distribution of controlled substances and is using the **Target Cell Phone** while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of the **Target Cell Phone** will assist case agents in determining MACIAS' DTO activities, DTO meeting locations, co-conspirators, and sources of supply.

56.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices

to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

57.     Based on my training and experience, I know that AT&T can also collect timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

## Cell-Site Data

58.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider

23

typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

59.     Based on my training and experience, I know that AT&T also can collect per-call measurement data, which AT&T also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

### E-911 Phase II / GPS Location Data

60.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II

24

data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available.

### Subscriber Information

61.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phone's** user or users and may assist in the identification of co-conspirators and/or victims.

### AUTHORIZATION REQUEST

62.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

63.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

64.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

65.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **30 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize

26

the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

66.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular device assigned call number **(760) 906-3615** (referred to herein and in Attachment B as "**Target Cell Phone**"), with listed subscriber unknown, that is in the custody or control of AT&T, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 111760 US Highway 1, North Palm Beach, Florida, 333408.

2.      The Target Cell Phone.

# ATTACHMENT B

## Particular Things to be Seized

## I.     Information to be Disclosed by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.     The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period October 1, 2022, to the present:

i.     Names (including subscriber names, user names, and screen names);

ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.     Local and long distance telephone connection records;

iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.     Length of service (including start date) and types of service utilized;

vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber

Identity Identifiers ("IMSI"), or International Mobile Equipment
Identities ("IMEI");

vii.     Other subscriber numbers or identities (including the registration
Internet Protocol ("IP") address); and

viii.    Means and source of payment for such service (including any credit
card or bank account number) and billing records; and

ix.      All records and other information (not including the contents of
communications) relating to wire and electronic communications
sent or received by the Target Cell Phone for the time period
September 1, 2021, to the present including:

a.  the date and time of the communication, the method of the
communication, and the source and destination of the
communication (such as the source and destination telephone
numbers (call detail records), email addresses, and IP
addresses); and

b.  information regarding the cell tower and antenna face (also
known as "sectors" through which the communications were
sent and received), as well as timing advance or engineering
data commonly referred to as per call measurement data
(PCMD, RTT, True Call, Advance Timing, Network Event
Location Operating System Information (NELOS), WebMap, or
equivalent).

b.   Information associated with each communication to and from the Target
Cell Phone for a period of **30** days from the date of this warrant, including:

i.     Any unique identifiers associated with the cellular device,
including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii.    Source and destination telephone numbers;

iii.   Date, time, and duration of communication; and

iv.    All data about the cell towers (i.e. antenna towers covering specific
geographic areas) and sectors (i.e. faces of the towers) to which the
Target Cell Phone will connect at the beginning and end of each
communication, as well as timing advance or engineering data
commonly referred to as per call measurement data (PCMD, RTT,

True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c.   Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, RTT data, GPS data, latitude-longitude data, and other precise location information.

   i.   To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

   ii.   This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving Jimmy GONZALEZ MACIAS, a/k/a Jimmy MACIAS (MACIAS).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts

3

under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
## 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this certification is true and correct.  I am employed by AT&T, and my title

is _____.  I am qualified to authenticate the records attached

hereto because I am familiar with how the records were created, managed, stored, and

retrieved.  I state that the records attached hereto are true duplicates of the original

records in the custody of AT&T.  The attached records consist of

_____.

I further state that:

a.     All records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly

conducted business activity of AT&T and they were made by AT&T as a regular

practice; and

b.     Such records were generated by AT&T's electronic process or system that

produces an accurate result, to wit:

1.     The records were copied from electronic device(s), storage

medium(s), or file(s) in the custody of AT&T in a manner to ensure that they are true

duplicates of the original records; and

2

2.      The process or system is regularly verified by AT&T and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                                            Signature

3